# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION

|  |  |
|---|---|
| EDWIN WONG, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| | ) **CIVIL ACTION NO.** |
| Plaintiff, | ) ) |
| | ) |
| vs. | ) CLASS ACTION COMPLAINT |
| | ) |
| CNL HOTELS & RESORTS, INC., (F/K/A CNL HOSPITALITY PROPERTIES, INC.), CNL HOTEL DEVELOPMENT COMPANY, CNL HOSPITALITY CORP, CNL FINANCIAL GROUP, INC., CNL REAL ESTATE GROUP INC., FIVE ARROWS REALTY SECURITIES II, LLC, CNL HOSPITALITY PARTNERS, L.P., JAMES M. SENEFF, JR., ROBERT A. BOURNE, THOMAS J. HUTCHISON III, JOHN A. GRISWOLD, CHARLES E. ADAMS, LAWRENCE A. DUSTIN, CRAIG M. MCALLISTER, AND ROBERT E. PARSONS, JR. | ) ) ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Plaintiff, Edwin Wong ("Plaintiff"), individually and on behalf of all other persons similarly

situated, by his undersigned attorneys, for his complaint against defendants, alleges the following

based upon personal knowledge as to himself and his own acts, and information and belief as to all

other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which

included, among other things, a review of the defendants' public documents, conference calls and

announcements made by defendants, United States Securities and Exchange Commission ("SEC")

filings, wire and press releases published by and regarding CNL Hospitality Properties, Inc. ("CNL"

or the "Company") securities analysts' reports and advisories about the Company, and information

readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist

for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of: (a) a class of all person who were entitled

to vote on the proxy statement filed with the SEC by CNL dated May 7, 2004, who suffered harm

as a result of the actions complained of herein; and (b) a class of all persons who purchased or

otherwise acquired CNL securities pursuant to the CNL's Prospectuses and Registration Statements,

between August 16, 2001 and August 16, 2004, inclusive (the "Class Period")

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11 12(a), and 15 of

the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77(o)) and to Section 14(a) of the Exchange Act

15 U.S.C. §78n(a).

3.      This Court has jurisdiction over the subject matter of this action pursuant Section

22(a) of the Securities Act (15 U.S.C. § 77v(a)) and section 27 of the Exchange Act (15 U.S.C.

§78aa) and 28 U.S.C. § 1331, 1337.

4.      Venue is proper in this Judicial District pursuant to Section 22(a) of the Securities

Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act, 15 U.S.C. § 78 aa and 28 U.S.C. §

1391(b).   Many of the acts and transactions alleged herein, including the preparation and

dissemination of materially false and misleading information, occurred in substantial part in this

District. Additionally, the Company maintains its principal executive offices in this Judicial District.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, Edwin Wong, as set forth in the accompanying certification, incorporated by reference herein, purchased CNL securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant CNL is an Maryland corporation with its principal place of business located at 459 South Orange Avenue, Orlando Flordia.

8.     Defendant CNL's operating partnerships are Defendants CNL Hospitality Partners, L.P. ("CNL LP"), a Delaware liited partnership, and RFS Partnership, L.P. ("RFS"), a Tennessee limited partnership.

9.     Defendant CNL Hospitality Corp., a Florida Corporation, and its wholly owned subsidiary, defendant CNL Hotel Development Company ("CHD" or the "Advisor"), provide management, advisory and administrative serviced.

10.     The Advisor is owned directly or indirectly by the following entity defendants who are collectively, along with the Advisor, referred to herein as the "Advisor";

(a)     Defendant CNL Financial Group, Inc. ("CFG") - CFG is a Florida Corporation and CFG is a wholly-owned subsidiary of CNL Holdings, Inc., which is controlled jointly by Defendant James M. Seneff, Jr. and his wife.

(b)     Defendant CNL Real Estate Group, Inc. ("GREG")- GREG is a Florida corporation.  GREG is a wholly-owned subsidiary of CFG and owns approximately 53.3% of the shares of outstanding common stock of the Advisor.

(c)     Defendant Five Arrows Reality Securities II, LLC ("Five Arrows") - Five Arrows is a Delaware limited liability company.  Five Arrows owns 10% of the shares of outstanding common stock of the Advisor.

11.     Defendant James M. Seneff, Jr. ("Seneff") serves as Chairman of the Board of Directors of CNL.

12.     Defendant Robert A. Bourne ("Bourne") serves as a Vice-Chairman of the Board of Directors of CNL.

13.     Defendant Thomas J. Hutchison ("Hutchison") has served as CNL's Chief Executive Officer since May 2003.

14.     Defendant John A. Griswold ("Griswold") has served as CNL's President since March of 2003 and as CNL's Chief Operating Officer since October of 2003.

15.     Defendant Adams has served as a director of CNL since 1999.

16.     Defendant Charles E. Adams ("Adams") has served as the President and a founding principal of Celebration Associates, LLC, a real estate advisory and development firm.

17.     Defendant Lawrence A. Dustin ("Dustin") has served as a director of CNL since 1999.

18.     Defendant Craig M. McAllaster ("McAllaster") has served as a director of CNL since 1999.

4

19.     Defendant Robert E. Parsons, Jr. ("Parsons") has served as a director of CNL since September 2003.

20.     Defendants named in ¶¶ 11-19 are collectively referred to hereinafter as the "Individual Defendants."  During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of CNL were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

22.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of CNL, by virtue

of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

23.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with CNL, each of the Individual Defendants had access to the adverse undisclosed information about CNL financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about CNL and its business issued or adopted by the Company materially false and misleading.

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent

6

their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

25.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of CNL securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding CNL business, operations, management and the intrinsic value of CNL securities; and (ii) caused Plaintiff and other members of the Class to purchase CNL securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class; (a) of all person who were entitled to vote on the proxy statement filed with the SEC by CNL dated May 7, 2004, who suffered harm as a result of the actions complained of herein; and (b) a class of all persons who purchased or otherwise acquired CNL securities pursuant to the CN:'s Prospectuses and Registration Statements, between August 16, 2001 and August 16, 2004, inclusive (the "Class Period").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands

of members in the proposed Class.  Record owners and other members of the Class may be identified

from records maintained by CNL or its transfer agent and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class actions.

28.     Plaintiff's claims are typical of the claims of the members of the Class as all members

of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that

is complained of herein.

29.     Plaintiff will fairly and adequately protect the interests of the members of the Class

and has retained counsel competent and experienced in class and securities litigation.

30.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants' acts as alleged

herein;

(b)  whether statements made by defendants to the investing public during the Class

Period misrepresented material facts about the business, operations and management of CNL; and

(c)  to what extent the members of the Class have sustained damages and the proper

measure of damages.

31.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

32.     CNL was organized pursuant to the laws of the State of Maryland on June 12, 1996. The Company was formed primarily to acquire  properties (the  "Properties") located  across the United States to be leased for  generally  five to 20 years, plus  renewal  options  generally  for  up to  an  additional  20  years  on  a "triple-net"  basis,  which means that the tenants generally are responsible for repairs,  maintenance,  property taxes,  utilities and  insurance.  Third party tenants are  operators  of  selected  national  and  regional  limited  service, extended stay and full service hotel chains (the "Hotel  Chains").  In 2001, the Company began operating  Properties using independent  third party managers,  as permitted by the REIT Modernization Act of 1999. It is expected that the Company will move from triple-net  lease  activities to owning and operating Properties using third parties to manage the Properties' day to day operations.

33.     In a Form S-3 filed with the SEC on April 30, 2004, CNL announced that it was going to engage in a firm commitment underwritten offering of additional common shares and preferred shares (the "Underwritten Offering") and to list those common shares and preferred share together with  the  existing  outstanding  common  shares, on  the  New  York  Stock  Exchange  ("NYSE") ("Listing").  In connection  with  the possible Listing and Underwritten Offering, CNL sought shareholder approval, via a Proxy filed with the SEC on May 7, 2004, to become a self-advised REIT

through the merge of CNL Hospitality Corp. (the "Advisor") into a wholly owned subsidary of CNL

("Merger").

### Materially False And Misleading
### Statements Issued During The Class Period

34.     On August 24, 2001, CNL filed a Rule 424B3 prospectus ("Prospectus") with the

SEC. Therein, CNL represented the following:

> The following Unaudited Pro Forma Consolidated Balance Sheet
> of CNL Hospitality Properties, Inc. and subsidiaries (the
> "Company") gives effect to (i) the receipt of an initial capital
> contribution of $200,000 from the Advisor, $648,633,665 in gross
> offering proceeds from the sale of 64,863,367 shares of common
> stock for the period from inception through June 30, 2001, and the
> application of such funds to purchase 25 properties, including two
> on which hotel properties are being constructed, to acquire an 89
> percent interest in a limited liability company which owned one
> property as of June 30, 2001, to invest in CNL Hotel Investors, Inc.
> ("Hotel Investors") which owned seven properties as of June 30,
> 2001, to invest in a joint venture which owned one property as of
> June 30, 2001, on which a resort is being constructed, to redeem
> 403,607 shares of common stock pursuant to the Company's
> redemption plan, to acquire certain shares of 8% Class A Cumulative
> Preferred Stock and common stock of Hotel Investors and to pay
> offering expenses, acquisition fees and miscellaneous acquisition
> expenses, (ii) the receipt of $40,178,997 in gross offering proceeds
> from the sale of 4,017,900 additional shares for the period July 1,
> 2001 through August 15, 2001, and (iii) the application of such funds
> to (a) pay offering expenses, acquisition fees and miscellaneous
> acquisition expenses, (b) invest in a joint venture which owns one
> property that will be renovated, (c) to invest in a joint venture which
> will own four hotel properties and (d) fund estimated construction
> costs related to two properties under construction at June 30, 2001,
> all as reflected in the pro forma adjustments described in the related
> notes. The Unaudited Pro Forma Consolidated Balance Sheet as of
> June 30, 2001, includes the transactions described in (i) above from
> the historical balance sheet, adjusted to give effect to the
> transactions in (ii) and (iii) above as if they had occurred on June 30,
> 2001.

The Unaudited Pro Forma Consolidated Statements of Earnings for the six months ended June 30, 2001 and for the year ended December 31, 2000, includes the historical operating results of the properties described in (i) and (iii) above, from the date of their acquisitions plus operating results from (A) the later of (1) the date the property became operational or (2) January 1, 2000, to (B) the earlier of (1) the date the property was acquired by the Company or (2) the end of the pro forma period presented. Additionally, the Unaudited Pro Forma Consolidated Statements of Earnings gives effect to the acquisition of certain shares of 8% Class A Cumulative Preferred Stock and common stock of Hotel Investors, which resulted in majority control and therefore consolidation of Hotel Investors at December 31, 2000. In June 2001, the Company acquired the remaining 29% interest of Hotel Investors, resulting in the Company owning 100% of Hotel Investors at June 30, 2001.

35.     Additionally, CNL, with respect to its financial results for the period ended June 30, 2001, the following:

As of June 30, 2001, the Company owned 33 Properties, consisting of land, buildings and equipment, including three Properties on which hotel Properties are being constructed, and an interest in a joint venture on which a resort is being constructed. The Company has entered into long-term, triple-net lease agreements relating to these Properties. The Property leases generally provide for minimum base annual rental payments ranging from approximately $716,000 to $6,500,000, which are payable in monthly installments. Certain other leases with tenants who are affiliated with the Company provide for lease payments equal to the greater of a base rent or rent based on a percentage of total hotel sales. Certain of the leases also provide that, commencing in the second lease year, the annual base rent required under the terms of the leases will increase. In addition to annual base rent, the tenants generally pay contingent rent computed as a percentage of gross sales of the Properties. No such contingent rent has been earned as of June 30, 2001. The Company's leases also require the establishment of separate bank accounts for the replacement of furniture, fixtures, and equipment and routine capital items ("FF&E Accounts"). Deposits into the FF&E Accounts established for the Properties are owned by the Company and have been reported as additional rent ("FF&E Reserve Revenue") for the six months ended June 30, 2001 and 2000. The funds in the FF&E Accounts are maintained in restricted cash accounts, funded by the

11

tenants, that the tenants are expected to use for purposes specified in the leases, which include replacements, renewals and additions to furniture, fixtures and equipment of the Properties and routine capital expenditures relating to the Properties. The cash in the FF&E Account, any interest earned thereon, and any property purchased therewith remain, during and after the terms of the leases, the property of the Company.

During the six months ended June 30, 2001 and 2000, the Company earned rental income from operating leases and FF&E Reserve Revenue of $32,979,531 and $6,456,916, respectively ($17,140,725 and $3,571,785 of which was earned during the quarters ended June 30, 2001 and 2000, respectively). The increase in rental income and FF&E Reserve Revenue is due to the Company owning 33 Properties during the six months ended June 30, 2001, as compared to 15 Properties during the six months ended June 30, 2000 and due to the consolidation of Hotel Investors in October 2000. Because additional Property acquisitions are expected to occur, revenues for the six months ended June 30, 2001, represent only a portion of revenues which the Company is expected to earn in future periods.

During the six months ended June 30, 2001 and 2000, the Company earned $1,936,032 and $3,961,188, respectively, in interest income from investments in money market accounts and other short-term highly liquid investments and other income ($1,061,639 and $2,191,979 of which was earned during the quarters ended June 30, 2001 and 2000, respectively). The decrease in interest income was primarily attributable to a decrease in the average dollar amount invested in short-term, liquid investments and the period of time the funds were invested as compared to 2000. As Net Offering Proceeds from this offering are invested in Properties and used to make Mortgage Loans, the percentage of the Company's total revenues from interest income from investments in money market accounts or other short-term, highly liquid investments is expected to remain constant or decrease.

In connection with the Company's investment in Hotel Investors, the Company recorded $1,853,735 in dividend income and $260,437 in equity in loss after deduction of preferred stock dividends, resulting in net earnings of $1,593,298 for the six months ended June 30, 2000. In October 2000, the Company purchased a majority ownership interest in Hotel Investors, which resulted in the

consolidation of Hotel Investors. As such, no dividend income was recognized for the quarter or six months ended June 30, 2001. The equity in loss of unconsolidated subsidiaries for the quarter and six months ended June 30, 2001 related to the Company's investment in the Desert Ridge Joint Venture.

Operating expenses, including depreciation and amortization expense and interest expense, were $21,089,449 and $3,157,168 for the six months ended June 30, 2001 and 2000, respectively ($10,363,451 and $1,765,588 of which was incurred during the quarters ended June 30, 2001 and 2000, respectively) representing 60% and 26%, respectively, of total revenues for the six months ended June 30, 2001 and 2000. The increase in operating expenses during the six months ended June 30, 2001, as compared to 2000, was the result of the Company owning 33 Properties during 2001 compared to 15 Properties in 2000 and the consolidation of Hotel Investors in October 2000. Interest expense increased from $16,222 for the six months ended June 30, 2000 to $7,070,327 for the six months ended June 30, 2001, primarily due to the consolidation of Hotel Investors in October 2000 and an increase in the amount of indebtedness as compared to 2000. The dollar amount of operating expenses is expected to increase as the Company acquires additional Properties and invests in Mortgage Loans. However, general operating and administrative expenses as a percentage of total revenues is expected to decrease as the Company acquires additional Properties and invests in Mortgage Loans.

Pursuant to the Advisory Agreement, the Advisor is required to reimburse the Company the amount by which the total Operating Expenses paid or incurred by the Company exceed in any four consecutive fiscal quarters, the greater of 2% of Average Invested Assets or 25% of Net Income. For the quarters and six months ended June 30, 2001 and 2000, the Company's Operating Expenses did not exceed the Expense Cap.

Two of the Company's tenants contributed 47% and 46% of total rental income for the quarter and six months ended June 30, 2001, respectively. In addition, a significant portion of the Company's rental income was earned from Properties operating as Marriott brand chains during the six months ended June 30, 2001. Although the Company intends to acquire additional Properties located in various states and regions and to carefully screen its tenants in order to reduce risks of default, failure of these lessees or the Marriott

13

chains could significantly impact the results of operations of the Company. However, management believes that the risk of such a default is reduced  due to initial and continuing due diligence performed by the Company. It is expected that the percentage of total rental income contributed by these lessees will decrease as additional Properties are acquired and leased during 2001 and subsequent years.

36.    On September 21, 2001, CNL filed a Prospectus and a POS AM with SEC. The Company's Prospectus and POS AM were signed by defendants Seneff, Bourne, Adams, Dustin, Griswold, and McAllister.  Therein, CNL stated:

> During the six months ended June 30, 2001 and 2000, the Company earned $1,936,032 and $3,961,188, respectively, in interest income from investments in money market accounts and other short-term highly liquid investments and other income ($1,061,639 and $2,191,979 of which was earned during the quarters ended June 30, 2001 and 2000, respectively). The decrease in interest income was primarily attributable to a decrease in the average dollar amount invested in short-term, liquid investments and the period of time the funds were invested as compared to 2000. As Net Offering Proceeds from this offering are invested in Properties and used to make Mortgage Loans, the percentage of the Company's total revenues from interest income from investments in money market accounts or other short-term, highly liquid investments is expected to remain constant or decrease.
>
> In connection with the Company's investment in Hotel Investors, the Company recorded $1,853,735 in dividend income and $260,437 in equity in loss after deduction of preferred stock dividends, resulting in net earnings of $1,593,298 for the six months ended June 30, 2000. In October 2000, the Company purchased a majority ownership interest in Hotel Investors, which resulted in the consolidation of Hotel Investors. As such, no dividend income was recognized for the quarter or six months ended June 30, 2001. The equity in loss of unconsolidated subsidiaries for the quarter and six months ended June 30, 2001 related to the Company's investment in the Desert Ridge Joint Venture.
>
> Operating expenses, including depreciation and amortization expense and interest expense, were $21,089,449 and $3,157,168 for the six months ended June 30, 2001 and 2000, respectively ($10,363,451 and

14

$1,765,588 of which was incurred during the quarters ended June 30, 2001 and 2000, respectively) representing 60% and 26%, respectively, of total revenues for the six months ended June 30, 2001 and 2000. The increase in operating expenses during the six months ended June 30, 2001, as compared to 2000, was the result of the Company owning 33 Properties during 2001 compared to 15 Properties in 2000 and the consolidation of Hotel Investors in October 2000. Interest expense increased from $16,222 for the six months ended June 30, 2000 to $7,070,327 for the six months ended June 30, 2001, primarily due to the consolidation of Hotel Investors in October 2000 and an increase in the amount of indebtedness as compared to 2000. The dollar amount of operating expenses is expected to increase as the Company acquires additional Properties and invests in Mortgage Loans. However, general operating and administrative expenses as a percentage of total revenues is expected to decrease as the Company acquires additional Properties and invests in Mortgage Loans.

Pursuant to the Advisory Agreement, the Advisor is required to reimburse the Company the amount by which the total Operating Expenses paid or incurred by the Company exceed in any four consecutive fiscal quarters, the greater of 2% of Average Invested Assets or 25% of Net Income. For the quarters and six months ended June 30, 2001 and 2000, the Company's Operating Expenses did not exceed the Expense Cap.

Two of the Company's tenants contributed 47% and 46% of total rental income for the quarter and six months ended June 30, 2001, respectively. In addition, a significant portion of the Company's rental income was earned from Properties operating as Marriott brand chains during the six months ended June 30, 2001. Although the Company intends to acquire additional Properties located in various states and regions and to carefully screen its tenants in order to reduce risks of default, failure of these lessees or the Marriott chains could significantly impact the results of operations of the Company. However, management believes that the risk of such a default is reduced due to initial and continuing due diligence performed by the Company. It is expected that the percentage of total rental income contributed by these lessees will decrease as additional Properties are acquired and leased during 2001 and subsequent years.

37.     On October 31, 2001, CNL filed an amended registration statement on Form S-11/A with the SEC.  The Company's Form S-11/A was signed by defendants Seneff, Bourne, Adams, Dustin, Griswold, and McAllister.  The Company's Form S-11/A reaffirmed the information contained in ¶¶ 34-36.

38.     On December 20, 2001, CNL filed a Prospectus and POS AM with the SEC.  The Company's Prospectus and POS AM was signed by defendants Seneff, Bourne, Adams, Griswold, and McAllister.  Therein, the Company stated:

> As of September 30, 2001, the Company owned interests in 39 Properties, consisting of land, buildings and equipment, including seven Properties on which hotel Properties are being constructed or renovated, and interests in three joint ventures. The Company has entered into triple-net lease agreements relating to these Properties. The Property leases generally provide for minimum base annual rental payments ranging from approximately $716,000 to $17,800,000, which are payable in monthly installments. Certain other leases with tenants who are affiliated with the Company provide for lease payments equal to the greater of a base rent or rent based on a percentage of total hotel sales. Certain of the leases also provide that, commencing in the second lease year, the annual base rent required under the terms of the leases will increase. In addition to annual base rent, the tenants generally pay contingent rent computed as a percentage of gross sales of the Properties. No such contingent rent has been earned as of September 30, 2001. The Company's leases also require the establishment of separate bank accounts for the replacement of furniture, fixtures, and equipment and routine capital items ("FF&E Accounts"). Deposits into the FF&E Accounts established for the Properties where the tenant is an unrelated third party are owned by the Company and have been reported as additional rent ("FF&E Reserve Revenue") for the nine months ended September 30, 2001 and 2000. For these Properties, the funds in the FF&E Accounts are maintained in restricted cash accounts, funded by the tenants, that the tenants are expected to use for purposes specified in the leases, which include replacements, renewals and additions to furniture, fixtures and equipment of the Properties and routine capital expenditures relating to the Properties. The cash in the FF&E Accounts, any interest earned thereon, and

16

any property purchased therewith remain, during and after the terms of the leases, the property of the Company. Deposits into the FF&E Accounts for certain other Properties, where the tenant is a subsidiary of the Company, are owned by the tenant and are not reported as additional rent for the nine months ended September 30, 2001 and 2000.

During the nine months ended September 30, 2001 and 2000, the Company earned rental income from operating leases and FF&E Reserve Revenue of $49,890,912 and $12,718,572, respectively ($16,911,381 and $6,261,656 of which was earned during the quarters ended September 30, 2001 and 2000, respectively). The increase in rental income and FF&E Reserve Revenue is due to the Company owning interests in 39 Properties during the nine months ended September 30, 2001, as compared to 22 Properties during the nine months ended September 30, 2000 and due to the consolidation of Hotel Investors in December 2000. Because additional Property acquisitions are expected to occur, revenues for the quarter and nine months ended September 30, 2001, represent only a portion of revenues which the Company is expected to earn in future periods.

During the nine months ended September 30, 2001 and 2000, the Company earned $2,903,018 and $5,312,997, respectively, in interest income from investments in money market accounts and other short-term highly liquid investments and other income ($966,986 and $1,351,809 of which was earned during the quarters ended September 30, 2001 and 2000, respectively). The decrease in interest income was primarily attributable to a decrease in the average dollar amount invested in short-term, liquid investments and the period of time the funds were invested as compared to 2000. As Net Offering Proceeds from this offering are invested in Properties and used to make Mortgage Loans, the percentage of the Company's total revenues from interest income from investments in money market accounts or other short-term, highly liquid investments is expected to remain constant or decrease.

In connection with the Company's investment in Hotel Investors, the Company recorded $2,780,566 in dividend income and $386,627 in equity in loss after deduction of preferred stock dividends, resulting in net earnings of $2,393,939 for the nine months ended September 30, 2000. In December 2000, the Company purchased an additional interest in Hotel Investors, which resulted in a majority ownership interest and the consolidation of Hotel Investors as of December 31, 2000. As such, no dividend income was

17

recognized for the quarter or nine months ended September 30, 2001. The equity in loss of unconsolidated subsidiaries for the quarter and nine months ended September 30, 2001 related to the Company's investment in the Desert Ridge Joint Venture and the Waikiki Joint Venture.

Operating expenses, including depreciation and amortization expense and interest expense, were $32,618,000 and $6,182,433 for the nine months ended September 30, 2001 and 2000, respectively ($11,528,551 and $3,025,265 of which was incurred during the quarters ended September 30, 2001 and 2000, respectively) representing 59% and 30% of total revenues for the nine months ended September 30, 2001 and 2000, respectively. The increase in operating expenses during the nine months ended September 30, 2001, as compared to 2000, was the result of the Company owning interests in 39 Properties during 2001 compared to 22 Properties in 2000 and the consolidation of Hotel Investors in October 2000. Additionally, interest expense increased from $26,155 for the nine months ended September 30, 2000 to $10,413,514 for the nine months ended September 30, 2001 ($3,343,187 and $9,933 of which was incurred during the quarters ended September 30, 2001 and 2000, respectively), primarily due to the consolidation of Hotel Investors in December 2000 and an increase in the amount of indebtedness as compared to 2000. The dollar amount of operating expenses is expected to increase as the Company acquires additional Properties and invests in Mortgage Loans. However, general operating and administrative expenses as a percentage of total revenues is expected to decrease as the Company acquires additional Properties and invests in Mortgage Loans.

Pursuant to the Advisory Agreement, the Advisor is required to reimburse the Company the amount by which the total Operating Expenses paid or incurred by the Company exceed in any four consecutive fiscal quarters, the greater of 2% of Average Invested Assets or 25% of Net Income. For the quarters and nine months ended September 30, 2001 and 2000, the Company's Operating Expenses did not exceed the Expense Cap.

Two of the Company's tenants contributed 44% and 42% of total rental income for the quarter and nine months ended September 30, 2001, respectively. In addition, a significant portion of the Company's rental income was earned from Properties operating as Marriott brand chains during the nine months ended September 30,

2001.  Although the Company intends to acquire additional Properties located in various states and regions and to carefully screen its tenants in order to reduce risks of default, failure of these lessees or the Marriott chains could significantly impact the results of operations of the Company. However, management believes that the risk of such a default is reduced due to initial and continuing due diligence performed by the Company.  It is expected that the percentage of total rental income contributed by these lessees will decrease as additional Properties are acquired and leased during 2001 and subsequent years.

39.     Additionally, CNL, with respect to how it determines its offering price, stated:

DETERMINATION OF OFFERING PRICE

The offering price per Share was determined by the Company based upon the estimated costs of investing in the Properties and the Mortgage Loans, the fees to be paid to the Advisor and its Affiliates, as well as fees to third parties, and the expenses of this offering.

40.     On March 14, 2002, CNL filed a Prospectus and POS AM with the SEC.  The Company's Prospectus and POS AM was signed by defendants Seneff, Bourne, Adams, Griswold, and McAllister.  Therein, CNL stated:

RESULTS OF OPERATIONS

Comparison of year ended  December 31, 2001 to year ended December 31, 2000

As of December 31, 2001, the Company owned interests in 43 Properties, consisting of land, buildings and equipment, including seven Properties on which hotel Properties are being constructed or renovated, and interests in eight joint ventures. The Company has entered into triple-net lease agreements or operates these Properties using independent third party managers.

During the years ended December 31, 2001 and 2000 , the Company earned rental income from operating leases, contingent rental income and FF&E Reserve revenue of $66,817,430 and $26,681,838 , respectively. The increase in rental income, contingent rental income and FF&E Reserve income was due to the Company directly owning

35 Properties during the year ended December 31, 2001, as compared to 29 Properties during the year ended December 31, 2000. In addition, several of the Properties, which were owned for only a portion of 2000, were owned for a full year in 2001. Because additional Property acquisitions are expected to occur, revenues for the year ended December 31, 2001, represent only a portion of revenues which the Company is expected to earn in future periods. However, due to the fact that management expects that a majority of the new acquisitions will be operated by the Company using independent third party managers and the Company plans to take assignment of certain existing leases from unrelated tenants, rental income from operating leases, contingent rental income, and FF&E Reserve income are not expected to continue to increase at the same rate in the future, but instead will be replaced by hotel operating revenues.

During the years ended December 31, 2001 and 2000 , the Company earned $3,494,238 and $6,637,318 , respectively, in interest income from investments in money market accounts and other short-term, highly liquid investments and other income. The decrease in interest income was primarily attributable to a decrease in the average dollar amount invested in short-term, liquid investments during the year 2001 as compared to 2000. As Net Offering Proceeds from this offering are invested in Properties and used to make Mortgage Loans, the percentage of the Company's total revenues from interest income from investments in money market accounts or other short-term, highly liquid investments is expected to remain constant or decrease.

Four of the Company's tenants contributed approximately 70% and 75% of total rental income for the years ended December 31, 2001 and 2000, respectively. In addition, a significant portion of the Company's rental income was earned from Properties operating as Marriott brand chains for the years ended December 31, 2001 and 2000. Although the Company acquires Properties in various states and regions , carefully screens its tenants in order to reduce risks of default and has acquired four Hilton Properties through the Hilton Partnership, failure of these lessees or the Marriott brand chains could significantly impact the results of operations of the Company. However, management believes that the risk of such a default is reduced due to the initial and continuing due diligence procedures performed by the Company. It is expected that the percentage of total rental income contributed by these lessees will decrease as additional Properties are acquired in 2002 and subsequent years.

Operating expenses, including interest expense and depreciation and amortization expense, were $43,892,956 and $13,525,893 for the years ended December 31, 2001 and 2000 , respectively (61.4% and 37.5%, respectively, of total revenues). The increase in operating expenses during the year ended December 31, 2001, as compared to 2000, was the result of the Company directly owning 35 Properties in 2001 compared to 29 Properties during 2000.  Additionally, interest expense increased from $2,383,449 for the year ended December 31, 2000 to $14,653,011 for the year ended December 31, 2001, as a result of the Company securing additional Permanent Financing and draws on the Revolving LOC in 2001.

Equity in loss of unconsolidated subsidiaries was $7,092,674 and $386,627 for the years ended December 31, 2001 and 2000, respectively. The increase in the loss from unconsolidated subsidiaries during the year ended December 31, 2001, was due primarily to pre-opening and marketing expenses incurred by the Desert Ridge Joint Venture during the year ended December 31, 2001 and operating losses at the Waikiki Beach Property which occurred as a result of a significant portion of the Waikiki Beach Property being closed for renovations. Additional pre-opening and marketing expenses are expected to be incurred during 2002 by the Desert Ridge Joint Venture in preparation for the expected opening of the Desert Ridge Property in January 2003. Operating losses at the Waikiki Beach Property will likely continue until expected renovations are completed and international tourism rebounds from the events of September 11, 2001.

Pursuant to the Advisory Agreement, the Advisor is required to reimburse the Company the amount by which the total Operating Expenses paid or incurred by the Company exceed in any four consecutive fiscal quarters, the greater of 2% of Average Invested Assets or 25% of Net Income (the "Expense Cap"). For the years ended December 31, 2001 and 2000 , the Company's Operating Expenses did not exceed the Expense Cap.

41.     Additionally, CNL, with respect to how it determined its offering price, stated:

DETERMINATION OF OFFERING PRICE

The offering price per Share was determined by the Company based upon the estimated costs of investing in the Properties and the

Mortgage Loans, the fees to be paid to the Advisor and its Affiliates, as well as fees to third parties, and the expenses of this offering.

42.     On March 28, 2002, CNL filed an amended Form S-11/A with the SEC.   The

Company's Form S-11/A was signed by defendants Seneff, Bourne, Adams, Dustin, Griswold, and

McAllister and reaffirmed the information plead in ¶¶ 38-40.

43.     On June 26, 2002, CNL filed a Prospectus and POS AM with the SEC.   The

Company's Prospectus and POS AM were signed by defendants Seneff, Bourne, Adams, Dustin,

Griswold, and McAllister.   Therein, the Company stated:

RESULTS OF OPERATIONS

Comparison of quarters ended March 31, 2002 and March 31, 2001

As of March 31, 2002, the Company owned interests in 47 Properties, consisting of land, buildings and equipment, including five Properties on which hotel Properties are being constructed or renovated, and interests in four joint ventures. The Company has entered into triple-net lease agreements or operates these Properties using third party managers.

During the quarters ended March 31, 2002 and 2001, the Company earned rental income from operating leases and FF&E Reserve income of $12,034,944 and $15,838,806, respectively. Although the number of Properties owned by the Company increased, the decrease in rental income and FF&E reserve income was due to the Company taking assignment of leases on seven existing Properties and engaging third party managers to operate these Properties. Additionally, two Properties that were acquired at the end of 2001 are also operated by third party managers. This resulted in rental income from operating leases and FF&E reserve income for these Properties being replaced by hotel operating revenues and expenses during the first quarter of 2002. Additional Property leases may be assigned to the Company and these, and other Properties acquired in the future, will likely be leased to a TRS and operated using third party managers, consistent with the Company's strategy. As a result, the amount of rental income from operating leases is expected to continue to decline as a percentage of total revenues while hotel operating revenue is expected

22

to increase. Hotel operating revenue during the quarter ended March 31, 2002 was $14,661,413.

During the quarters ended March 31, 2002 and 2001, the Company earned $450,214 and $874,393, respectively, in interest income from investments in money market accounts and other short-term, highly liquid investments and other income. The decrease in interest income was primarily attributable to a decrease in the average dollar amount invested in short-term, liquid investments and the period of time the funds were invested in such accounts as compared to 2001. As net offering proceeds are invested in Properties and used to make Mortgage Loans, the percentage of the Company's total revenues from interest income from investments in money market accounts or other short-term, highly liquid investments is expected to remain constant or decrease.

Operating expenses, including depreciation and amortization, interest, and hotel operating expenses, were $22,256,770 and $10,725,998 for the quarters ended March 31, 2002 and 2001, respectively. The increase in operating expenses during the period, as compared to 2001, was the result of the Company owning interests in 47 Properties during 2002 compared to 32 Properties in 2001. During the quarter ended March 31, 2002, the Company incurred hotel expenses of $8,724,393, due to the Company's operation of a portion of its Properties using third party managers. No such expense was incurred during the quarter ended March 31, 2001. Additionally, interest expense increased from $3,599,652 for the quarter ended March 31, 2001 to $4,274,811 for the quarter ended March 31, 2002, primarily due to increased borrowing on the revolving line of credit. Operating expenses are expected to increase as the Company acquires additional Properties and invests in Mortgage Loans. However, general operating and administrative expenses as a percentage of the total revenues is expected to remain constant or decrease as the Company acquires additional Properties and invests in Mortgage Loans.

Equity in loss of unconsolidated subsidiaries of $1,169,900 for the quarter ended March 31, 2002, was due primarily to pre-opening and marketing expenses incurred during the construction of a resort owned through a joint venture and losses at a resort partially closed for renovations. Losses are expected to continue through the remainder of 2002 as construction and renovation activities are completed and the resorts become fully operational.

44.     On August 13, 2002, CNL filed a registration statement on Form S-11 for the registration of 175,000,000 shares of common stock. The Company's Form S-11 was signed by defendants Seneff, Bourne, Adams, Dustin, Griswold, and McAllister and reaffirmed its financial results contained in ¶ 43.

45.     On November 21, 2002, CNL filed a Prospectus and POS AM with the SEC. The Company's Prospectus and POS AM were signed by defendants Seneff, Bourne, Adams, Dustin, Griswold, and McAllister. Therein, the Company stated:

> Comparison of quarter and nine months ended September 30, 2002 to quarter and nine months ended September 30, 2001
>
> Properties
>
> As of September 30, 2002, the Company owned  interests in 51 Properties (40 wholly owned and 11 held indirectly  through joint ventures),  consisting of land,  buildings and equipment,  including five Properties on which hotels are being constructed or renovated. One of the hotels under  construction  as of September  30, 2002, opened on November 5, 2002. Of these Properties, 37 are leased to TRS entities and operated by third-party managers, resulting in hotel revenues and expenses being reported in the condensed consolidated statements of earnings for the Company.  The remaining Properties are leased on a "triple-net" basis to third-party operators resulting in rental income from operating leases being reported in the condensed consolidated  statements  of earnings for the Company.
>
> Revenues
>
> Hotel operating revenues during the nine months ended September 30, 2002 and 2001 were $70,175,174 and $1,150,876, respectively ($37,648,057  and $1,150,876 of which was earned during the quarters ended  September 30, 2002 and 2001, respectively). For the nine months ended September 30, 2002 and 2001, the Company earned rental income from  operating  leases and FF&E Reserve income of $32,729,398 and $49,890,912, respectively ($8,313,157 and $16,911,381 of which  was earned during the quarters ended September 30, 2002 and 2001, respectively). The  increase in hotel

revenues and the decrease in rental income and FF&E Reserve
income was due to the Company taking assignment of leases on 18
existing Properties and engaging third-party managers to operate
these Properties during the nine months ended September 30, 2002.
Additionally, two Properties that were acquired at the end of 2001
and all of the new Properties acquired in 2002 are leased to TRS
entities of the Company and are operated using third-party
managers. This resulted in rental income from operating leases and
FF&E Reserve income for these Properties being replaced by hotel
operating revenues and expenses during 2002. Other existing
third-party leases may be assigned to the Company in the future and
Properties acquired in the future will likely be leased to TRS
entities and operated using third-party managers. As a result, the
amount of rental income from operating leases is expected to
continue to decline as a percentage of total revenues while hotel
operating revenues are expected to increase.

Interest and Other Income

During the nine months ended September 30, 2002 and 2001, the
Company earned $926,522 and $2,903,018, respectively ($315,098
and $966,986 of which was earned during the quarters ended
September 30, 2002 and 2001, respectively), in interest income from
investments in money market accounts and other short-term, highly
liquid investments. The decrease in interest income was primarily
attributable to a decrease in the average dollar amount invested in
short-term, liquid investments, a decrease in the average interest
rate earned and the period of time the funds were invested in such
accounts as compared to 2001. As net offering proceeds are invested
in Properties, used to make Mortgage Loans and used to invest in
other permitted investments, the percentage of the Company's
total revenues from interest income will vary depending on the
amount of future offering proceeds, the timing of investments and
interest rates in effect.

In June 2002, the Company recognized other income of $1,897,817,
which represents the net amount of (i) the release of the Company's
obligation to repay approximately $5.5 million in security
deposits resulting from the assumption of leases on 11 of its
existing Properties offset by (ii) the assumption of a liquidity
facility loan of approximately $3.6 million. . . .

Operating Expenses

Operating expenses, including depreciation and amortization, and interest expenses, were $88,653,573 and $32,618,000 for the nine months ended September 30, 2002 and 2001, respectively ($40,943,736 and $11,528,551 of which were incurred during the quarters ended September 30, 2002 and 2001, respectively). The increase in operating expenses during the period, as compared to 2001, was the result of the Company owning interests in 51 Properties during 2002 compared to 39 Properties in 2001. Additionally, during the nine months ended September 30, 2002 and 2001, the Company incurred hotel expenses of $45,582,159 and $1,515,808, respectively ($25,782,205 and $1,515,808 of which were incurred during the quarters ended September 30, 2002 and 2001 respectively), due to consolidated subsidiaries of the Company leasing a portion of the Company's Properties and employing third-party managers to operate the hotels. Additionally, interest expense increased from $10,413,514 for the nine months ended September 30, 2001 to $13,827,651 for the nine months ended September 30, 2002 (which includes an increase from $3,343,187 to $4,771,181 for the quarters ended September 30, 2001 and 2002, respectively), primarily due to increased borrowing on the revolving line of credit. Operating expenses are expected to increase as the Company acquires interests in additional Properties and invests in Mortgage Loans or other permitted investments. However, general operating and administrative expenses, exclusive of interest expense, as a percentage of total revenues is expected to decrease as the Company acquires interests in additional Properties and invests in Mortgage Loans or other permitted investments.

Losses from Unconsolidated Subsidiaries

Equity in losses of unconsolidated subsidiaries of $6,128,835 and $3,750,585 for the nine months ended September 30, 2002 and 2001 respectively ($2,926,619 and $3,557,914 for the quarters ended September 30, 2002 and 2001, respectively), were primarily due to pre-opening and marketing expenses incurred during the construction of a resort owned through a joint venture and losses at a resort which was open but undergoing significant renovations. Losses are expected to continue through the remainder of 2002 as construction and renovation activities are completed and the resorts become fully operational.

46.     On April 23, 2003, CNL filed a Prospectus and POS AM with the SEC.  The

Company's Prospectus and POS AM were signed by defendants Seneff, Bourne, Adams, Dustin,

Griswold, and McAllister.  Therein, the Company stated:

RESULTS OF OPERATIONS  (amounts in thousands)

COMPARISON OF YEAR ENDED DECEMBER 31, 2002 TO
YEAR ENDED DECEMBER 31, 2001

REVENUES

During the years ended December 31, 2002 and 2001, the Company
earned hotel operating revenues of approximately $101,005 and
$1,151, respectively.  The Company earned rental income from
operating leases and FF&E Reserve income of approximately $41,577
and $66,818 for the years ended December 31, 2002 and 2001,
respectively. The increase in hotel revenues and the decrease in rental
income and FF&E Reserve income was due to the Company investing
in new  Properties and leasing to TRS entities, as well as taking
assignment of leases on 18 existing Properties and engaging
third-party managers to operate these Properties during the year ended
December 31, 2002. For these Properties, rental income from
operating leases that was recorded in the past has been replaced with
hotel operating revenues and expenses as of the time that the lease
assumption occurred. Additionally, two Properties that were acquired
at the end of 2001 and all of the new Properties acquired in 2002 are
leased to TRS entities of the Company or of its partnerships and
operated using third-party managers. Because of the additional
acquisitions in 2002 and the additional Property acquisitions that are
expected to occur, results of operations are not expected to be
indicative of future periods.

INTEREST AND OTHER INCOME

During the years ended December 31, 2002 and 2001, the Company
earned approximately $1,529 and $3,494, respectively, in interest
income from investments in money market accounts and other
short-term, highly liquid investments and from other income. The
decrease in interest income was primarily attributable to a decrease
in the average dollar amount invested in short-term liquid
investments, a decrease in average interest rate earned and the period

27

the funds were invested during 2002 as compared to 2001. As net offering proceeds are invested in long-term assets, the percentage of the Company's total revenues from interest income will vary depending on the amount of offering proceeds, the timing of investments and interest rates in effect.

The increase in other income during 2002 was primarily due to Marriott's one-time forgiveness of the amounts previously funded under certain credit enhancements, which resulted in other income of approximately $10,397 being recorded during the fourth quarter of 2002. Additionally, in June 2002, the Company recognized other income of approximately $1,900, representing the net of the release of the Company's obligation to repay approximately $5,500 in security deposits resulting from the assumption of leases on 11 of its existing Properties offset by the assumption of a liquidity facility loan of approximately $3,600.

OPERATING EXPENSES

Operating expenses, including amortization and depreciation, interest expenses and hotel expenses of consolidated subsidiaries, were approximately $124,170 and $43,893 for the years ended December 31, 2002 and 2001, respectively (79% and 61%, respectively, of total revenues). The increase in operating expenses during the year ended December 31, 2002, as compared to 2001, was the result of the Company directly owning interests in 44 operating Properties during 2002 compared to 35 Properties in 2001. Additionally, during the years ended December 31, 2002 and 2001, the Company incurred hotel expenses of approximately $65,601 and $1,516, respectively. Additionally, interest expense increased from $14,653 for 2001 to $18,330 for 2002, primarily due to increased borrowing on the Revolving LOC and proceeds from Permanent Financing. Operating expenses are expected to increase as the Company acquires interests in additional Properties and invests in Mortgage Loans or other permitted investments. However, general operating and administrative expenses, exclusive of interest expense, as a percentage of total revenues are expected to decrease as the Company makes additional investments. Asset Management Fees increased from $3,327 to $6,696 for the years ended December 31, 2001 and 2002, respectively, due to the additional fees on newly acquired Properties.

LOSSES FROM UNCONSOLIDATED SUBSIDIARIES

Equity in losses of unconsolidated subsidiaries of approximately $16,164 and $7,093 for the years ended December 31, 2002 and 2001, respectively, were primarily due to pre-opening and marketing expenses incurred during the construction of a resort owned through a partnership, losses at a resort owned through a partnership which was open but undergoing significant renovations and losses at a startup partnership which owns the licensing rights to the Mobil Travel Guide. Losses are expected to moderate, but continue in 2003 as these Properties establish market presence and capture market share.

47.     On July 14, 2003, CNL filed a Prospectus and POS AM with the SEC.   The

Company's Prospectus and POS AM were signed by defendants Seneff, Hutchison, Adams, Dustin,

Griswold, and McAllister.   Therein, the Company stated:

Revenues

During the quarters ended March 31, 2003 and 2002, the Company earned hotel operating revenues of approximately $38.3 million and $14.7 million, respectively. In addition, the Company earned rental income from operating leases and FF&E Reserve income of approximately $8.7 million and $12.0 million for the quarters ended March 31, 2003 and 2002, respectively. The increase in hotel revenues and the decrease in rental income and FF&E Reserve income was due to the Company investing in new Properties and leasing to TRS entities, as well as taking assignment of leases on 11 existing Properties and engaging third-party managers to operate these Properties during the year ended December 31, 2002. For these Properties, rental income from operating leases that was recorded in the past has been replaced with hotel operating revenues and expenses as of the time that the lease assumption occurred. Additionally, all of the new Properties acquired in 2002 and during the quarter ended March 31, 2003 are leased to TRS entities of the Company or of its partnerships and operated using third-party managers. Because of the additional acquisitions in 2002 and in the first quarter of 2003 and the additional Property acquisitions that are expected to occur, results of operations are not expected to be indicative of future periods.

Interest and Other Income

29

During the quarters ended March 31, 2003 and 2002, the Company earned approximately $3.2 million and $0.5 million, respectively, in interest income from investments in money market accounts and other short-term, highly liquid investments and from other income. Other income of $2.7 million and $0 was earned as a result of credit enhancement funding during the quarters ended March 31, 2003 and 2002, respectively. Interest income remained consistent during the quarters ended March 31, 2003 and 2002. As net offering proceeds are invested in Properties or other permitted investments, the percentage of the Company's total revenues from interest income will vary depending on the amount of offering proceeds, the timing of investments and interest rates in effect.

Operating Expenses

Operating expenses, including amortization and depreciation, interest expenses, Asset Management Fees and hotel expenses of consolidated subsidiaries, were approximately $43.6 million and $22.3 million for the quarters ended March 31, 2003 and 2002, respectively (87% and 82%, respectively, of total revenues). The increase in operating expenses during the quarter ended March 31, 2003, as compared to 2002, was the result of the Company owning interests in 60 operating Properties during 2003 compared to 47 Properties during 2002. Additionally, during the quarters ended March 31, 2003 and 2002, the Company incurred hotel expenses of approximately $26.2 million and $8.7 million, respectively, primarily due to the increase in the number of Properties leased to TRS entities, as described above in "Revenues." Further, interest expense increased from approximately $4.3 million for the quarter ended March 31, 2002 to approximately $5.0 million for the quarter ended March 31, 2003, primarily due to additional proceeds from Permanent Financing. General and administrative expenses for the quarter ended March 31, 2003 decreased approximately $0.1 million from March 31, 2002 due to a write off of bad debt of approximately $0.4 million during the quarter ended March 31, 2002 in connection with the Company taking assignment of certain leases from third parties, offset by increases due to growth in the Company. Total operating expenses are expected to increase as the Company acquires interests in additional Properties and invests in Mortgage Loans or other permitted investments. However, general operating and administrative expenses, exclusive of interest expense, as a percentage of total revenues is expected to decrease as the Company makes additional investments. Asset Management Fees increased from approximately $1.4 million to

approximately $2.3 million for the quarters ended March 31, 2002 and 2003, respectively, due to the additional fees on newly acquired Properties.

Losses from Unconsolidated Subsidiaries

Equity in losses of unconsolidated subsidiaries was approximately $89,000 and $1.2 million for the quarters ended March 31, 2003 and 2002, respectively. The losses during 2002 were primarily due to (i) marketing expenses incurred during the construction of the JW Marriott Desert Ridge Resort and Spa owned through a partnership, which opened in November 2002, (ii) losses at the Waikiki Beach Resort owned through a partnership which was open, but undergoing renovations during a significant portion of 2002, and (iii) losses at a startup partnership which owns the licensing rights to the Mobil Travel Guide. The improvement in 2003 was a result of the opening of the JW Marriott Desert Ridge Resort and Spa in November 2002. In addition, a new partnership in which the Company invested with Hilton experienced net income during 2003. Losses from the Desert Ridge Resort and Spa and the Waikiki Beach Resort may continue in 2003 until such time as these Properties establish market presence and capture market share, and could get worse if the economy fails to recover or becomes worse.

48.     On July 23, 2003, CNL filed another registration statement on Form S-11 with the SEC. This time, CNL registered 400 million shares for a public offering. The Company's Form S-11 was signed by defendants Seneff, Bourne, Adams, Dustin, Griswold, and McAllister. Therein, the Company reaffirmed the information contained in ¶ 46.

49.     On September 16, 2003, CNL filed a Prospectus and POS AM with the SEC. The Company's Prospectus and POS AM were signed by defendants Seneff, Hutchison, Adams, Dustin, Griswold, and McAllister. Therein, the Company reaffirmed the information contained in ¶ 46.

31

50.    On January 26, 2004, CNL filed a Prospectus and POS AM with the SEC.  The

Company's Prospectus and POS AM were signed by defendants Seneff, Hutchison, Adams, Dustin,

Griswold, and McAllister.  Therein, the Company stated:

> As of September 30, 2003 and 2002, the Company owned interests in 126 and 51 hotel Properties, respectively. The increase in hotel revenues for the quarter and nine months ended September 30, 2003 and the decrease in rental income and FF&E Reserve income for the nine months ended September 30, 2003 was due to the Company investing in new Properties and leasing them to TRS entities, as well as taking assignment of leases on 11 existing Properties and engaging third-party managers to operate these Properties during 2002. For these Properties, rental income from operating leases that was recorded during the first half of 2002 has been replaced with hotel operating revenues and expenses during the first half of 2003. Additionally, most of the Properties acquired in 2002 and during the nine months ended September 30, 2003 are leased to TRS entities of the Company and are operated using third-party managers. The decrease in rental income resulting from the lease assumptions discussed above was offset somewhat by an increase in rental income from five Properties acquired in July 2003 as a result of the RFS Transaction (see "Business - Property Acquisitions" for more information regarding the RFS Transaction). These Properties are leased on a triple-net basis to unrelated third-party tenants. The increase in rental income for the quarter ended September 30, 2003, as compared to the same period in 2002, was also a direct result of these five Properties being acquired. Results of operations are not expected to be indicative of future periods due to the additional acquisitions in late 2002 and in during the nine months ended September 30, 2003 and the additional Property acquisitions that are expected to occur.
>
> The increase in hotel operating expenses during the quarter and nine months ended September 30, 2003, as compared to the same periods in 2002, was primarily due to the increase in the number of Properties leased to TRS entities, as described above. Hotel operating expenses increased at a faster rate than hotel revenues resulting in decreased margins as a result of the continued economic slowdown in the lodging industry. The Company currently expects these conditions to continue to affect our Properties at least through the second quarter of 2004. Similarly, interest expense increased due to additional

32

proceeds from Permanent Financing used for acquisitions. Depreciation and amortization increased as a result of the additional Properties owned by the Company and Asset Management Fees increased due to additional fees earned on the new Properties acquired and owned by the Company.

During the nine months ended September 30, 2003 and 2002, the Company earned approximately $17.2 million and $2.8 million in interest and other income, respectively, $9.6 million and $0.3 million of which was earned during the quarters ended September 30, 2003 and 2002, respectively. The increase in interest and other income during the quarter and nine months ended September 30, 2003, as compared to the same periods in 2002, was primarily due to income recognition from credit enhancements and guaranty payments in 2003 which did not exist in 2002 (see "Business - Credit Enhancements"). Interest income also increased slightly during the nine months ended September 30, 2003 as compared with the same period in 2002 as a result of an increase in the amount of average cash invested during the period in money market accounts and other short-term, highly liquid investments. As net offering proceeds are invested in Properties or other permitted investments, the percentage of the Company's total revenues from interest income is expected to decrease but will vary depending on the amount of offering proceeds, the timing of investments and interest rates in effect.

51.     On May 7, 2004, CNL filed a proxy with the SEC on PREM 14A, as amended or supplemented on June 21, 20004, July 7, 2004, July 8, 2004, and July 20, 2004.  The Company's proxy statement was signed by the Individual Defendants and stated:

Notice is hereby given that the 2004 Annual Meeting of Stockholders of CNL Hospitality Properties, Inc., a Maryland corporation, will be held at CNL Center at City Commons, 450 South Orange Avenue, Orlando, Florida 32801 on July 19, 2004, at 11:00 a.m., Eastern time (such meeting, and any adjournment or postponement thereof, the "Annual Meeting"), for the following purposes:

1. To elect nine nominees to our board of directors to hold office until the 2005 Annual Meeting of Stockholders or until their respective successors are duly elected and qualify (which we refer to in the accompanying proxy statement as the "Director Proposal");

2. To consider and vote upon a proposal to approve the merger of CNL Hospitality Corp. (the "Advisor") with and into CNL Hospitality Properties Acquisition Corp., our wholly-owned subsidiary ("Acquisition Sub"), pursuant to an Agreement and Plan of Merger dated as of April 29, 2004, as amended on June 17, 2004, by and among us, our Acquisition Sub, the Advisor, the stockholders of the Advisor identified therein, and CNL Financial Group, Inc. (which we refer to in the accompanying proxy statement as the "Merger Proposal");

3. To consider and vote upon a proposal to approve an amendment to our amended and restated articles of incorporation (the "Articles") to increase the number of authorized equity shares from 516,000,000 shares (consisting of 450,000,000 common shares, 3,000,000 preferred shares and 63,000,000 excess shares) to 3,675,000,000 shares (consisting of 3,000,000,000 common shares, 75,000,000 preferred shares and 600,000,000 excess shares) (which we refer to in the accompanying proxy statement as the "Authorized Shares Proposal");

4. To consider and vote upon a proposal to approve an amendment and restatement of our Articles which requires the affirmative vote of the holders of a majority of our outstanding common shares (which we refer to in the accompanying proxy statement as the "Majority Vote Charter Amendment Proposal") to modify certain provisions to reflect that we have become self-advised and to conform more closely to the articles of incorporation of real estate investment trusts whose securities are publicly traded and listed on the New York Stock Exchange, Inc. ("Listed REITs");

5. To consider and vote upon a proposal to approve an amendment and restatement of each of our Articles and our by-laws, as amended ("By-Laws"), which requires the affirmative vote of the holders of at least two-thirds of our outstanding common shares (which we refer to in the accompanying proxy statement as the "Two-Thirds Vote Charter Amendment Proposal") to modify certain other provisions to reflect that we have become self-advised and to conform more closely to the articles of incorporation of other Listed REITs and to make certain corresponding conforming changes to our By-Laws. In the accompanying proxy statement, the Two-Thirds Vote Charter Amendment Proposal and the Majority Vote Charter Amendment Proposal are collectively referred to as the "Charter Amendment Proposals;"

34

6. To consider and vote upon a proposal to approve an amendment to our Articles to effect a one-for-two reverse stock split (which we refer to in the accompanying proxy statement as the "Reverse Stock Split Proposal");

7. To consider and vote upon a proposal to approve and adopt our 2004 Omnibus Long-Term Incentive Plan (which we refer to in the accompanying proxy statement as the "Incentive Plan Proposal"); and

8. To consider and act on any other matters that properly may be presented at the Annual Meeting, including proposals to adjourn the Annual Meeting with respect to proposals for which insufficient votes to approve were cast; and, with respect to such proposals, to permit further solicitation of additional proxies by our board of directors.

52.   CNL, with respect to its financial results, stated:

| | 2003 | 2002 |
|---|---|---|
| Year Ended December 31: | | |
| Revenues | $557,140 | $225,526 |
| Income from continuing operations | $4,771 | $15,810 |
| Income from discontinued operations | $1,222 | |
| Net earnings | $5,993 | $15,810 |
| Cash flows from operating activities | $112,887 | $76,660 |
| Cash flows used in investing activities | $1,894,612 | $551,987 |
| Cash flows from financing activities | $1,876,478 | $479,269 |
| Cash distributions declared | $129,961 | $74,217 |
| Funds from operations | $90,594 | $59,475 |
| Income from continued operations per share: | | |
| Basic | 0.02 | 0.16 |
| Diluted | 0.02 | 0.16 |
| Income from discontinued operations per share: | | |
| Basic | 0.01 | |
| Diluted | 0.01 | |
| Earnings per share: | | |
| Basic | 0.03 | 0.16 |
| Diluted | 0.03 | 0.16 |

| | | |
|---|---|---|
| Cash distributions declared per share | 0.78 | 0.78 |
| Weighted average number of shares outstanding: | | |
| Basic | $172,449 | $97,874 |
| Diluted | $172,449 | $97,874 |

53.   Additionally, CNL stated:

As of December 31, 2003 and 2002, we owned interests in 128 and 55 operating hotel and resort Properties, respectively. Out of the total increase in hotel and resort revenues during the year ended December 31, 2003, $248.2 million or 78% of the increase, resulted from the acquisition of additional Properties during 2002 and in 2003 (including the 57 Properties acquired through the RFS Acquisition (defined below). Hotel and resort revenues also increased as a result of our taking assignment of leases on 11 existing Properties and engaging third-party managers to operate these Properties. For these Properties, rental income from operating leases that was recorded during the first half of 2002 was replaced by hotel and resort operating revenues and expenses for the remainder of 2002 and all for of 2003. The remaining increase of $71.8 million or 22%, was due to improved year over year performance of our 27 comparable Properties and from the 11 Properties for which we took assignment of the leasing which were operated under the TRS structure for the entirety of both periods being presented.

The decrease in rental income for the year ended December 31, 2003 was due to our taking assignment of 11 existing leases, as discussed above, partially offset by an increase in rental income from five Properties acquired in July 2003, as a result of the RFS Acquisition which were leased to third-party tenants.

During the year ended December 31, 2003 and 2002, we received approximately $24.8 million and $10.3 million revenues from credit enhancements (4.4% and 4.6% of total revenues for the years ended December 31, 2003 and 2002, respectively). The increase in credit enhancement revenues during the year ended December 31, 2003, as compared to the same period in 2002, was due to the increase in the amount of credit enhancements available to and utilized by us. These guarantees are provided to us by third-party hotel and resort managers in order to guarantee a minimum return for some of our Properties. As a result of the downturn in the overall economy and other factors, and the resulting adverse effect on our operations, we have been relying on credit enhancements to substantially enhance our net

earnings and cash flows, and to partially fund distributions. During 2003, some of our credit enhancements were fully utilized or expired and for certain properties we obtained additional enhancements. To the extent that current credit enhancements outstanding are fully utilized, or expire, and we are not able to obtain additional enhancements, our results of operations and our ability to make distributions to stockholders may be adversely affected. As of December 31, 2003, we had $22.1 million available for funding under our remaining credit enhancements. There is no assurance that we will continue to be able to obtain additional credit enhancements in the future.

Of the total increase in hotel and resort operating expenses during the year ended December 31, 2003, as compared to the same period in 2002, $81.3 million resulted from the acquisition of additional Properties acquired during 2002 and in 2003 (including the 57 Properties acquired through the RFS Acquisition). Hotel and resort operating expenses also increased as a result of our taking assignment of leases on 11 existing Properties and engaging third-party managers to operate these Properties. The remaining increase of $170.3 million was due to increased year over year expenses of our 27 comparable Properties and from the 11 Properties for which we took assignment of the leases during 2002 which were operated under the TRS structure for the entirety of both periods being presented.

Hotel and resort operating expenses increased at a faster rate than hotel and resort revenues resulting in decreased margins as a result of the continued economic slowdown in the lodging industry, reduced revenues from telecommunication services at the Properties, higher hotel and resort related insurance premiums and increased wage pressure for employees hired by hotel and resort managers at the Properties. In addition, the shift in our Property portfolio toward a higher proportion of full service hotel and resort properties, has resulted in an increase in our food and beverage revenues, which generally have lower profit margins than other hotel departments.

54.    On July 20, 2003, CNL filed an amended registration statement on Form S-3/A. The Company's Form S-3/A was signed by the Individual Defendants and reaffirmed the information contained in ¶¶ 24-53.

55.     The statements contained in ¶¶ 34-54 were materially false and misleading when made because defendants failed to disclose or indicate the following:  (1) that the Company's reported earnings and cash were materially inflated and in violation of Generally Accepted Accounting Principles; (2) that as a result of this, the Company's offering price of $10 per share, were materially inflated and unsupportable by the Company's financial results; (3) that since 2001, cash from CNL's operations had represented a decreasing percentage of the funds used to pay dividends to its shareholders; and (4) that as result of this, the Company's Underwritten Offering was overpriced and unsupportable by CNL's projections.

### The Truth Begins to Emerge

56.     On July 30, 2004, GreenStreet Advisors, Inc. ("GreenStree") issued a report that stated:  "It is no wonder that these entities [such as CNL] seeks out retail investors, as most institutional investors would more thoroughly scrutinize the value of the shares."

57.     Shortly after the GreenStreet report, CNL, on August 3, 2004, cancelled the Underwritten Offering.  This decision also postponed the Merger for which it had received shareholder approval on July 30, 2004, and the Listing.

### FIRST CLAIM
### Violation Of Section 11 Of The Securities Act Against
### Promulgated Thereunder Against All Defendants

58.     Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 11 claim, including without limitation, scienter.

59.     This claim is brought by Plaintiff who obtained CNL securities pursuant to the Registration Statement on behalf of himself and other members of the Class. Each Class member acquired their shares pursuant to or traceable to, and in reliance on, the Prospectus.

60.     Individual Defendants as signatories of the Registration Statement and the Prospectus, as a directors and/or officers of CNL and controlling persons of the issuer, owed to the holders of the stock obtained through the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and the Prospectus at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement and the Prospectus as set forth herein. As such, defendants are liable to the Class.

61.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

62.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Prospectus, which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated §11 of the Securities Act.

63.     As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of CNL securities was artificially inflated and Plaintiff and the Class suffered substantial damage in connection with their ownership of CNL securities pursuant to the Registration Statement and the Prospectus/Proxy.

64.     CNL is the issuer of the stock sold via the Registration Statement.  As issuer of the stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

65.     At the times they obtained their shares of CNL, the Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

66.     At the times they obtained their shares of CNL, the Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

67.     This action is brought within one year after discovery of the untrue statements and omissions in and from the Prospectus/Proxy should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

68.     By virtue of the foregoing, plaintiff and the other members of the class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

### SECOND CLAIM
### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

69.     Plaintiff repeats and realleges each and every allegation contained above.

70.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all defendants.

71.     Defendants were sellers and offerors and/or solicitors of purchasers of the shares offered pursuant to the Prospectus.

72.     The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus.

73.     Defendants owed to the purchasers of CNL securities, including Plaintiff and other class members, the duty to make a reasonable and diligent investigation of the statements contained in the materials, including the Prospectus contained therein, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the materials as set forth above.

74.     Plaintiff and other members of the Class purchased or otherwise acquired CNL securities pursuant to and/or traceable to the defective Prospectus. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

75.     Plaintiff, individually and representatively, hereby offers to tender to defendants those securities which plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon. Class members who have sold their CNL securities are entitled to rescissory damages.

76.     By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of the Class who hold CNL securities purchased pursuant to a prospectus/registration statement have the right to rescind and recover the consideration paid for their CNL securities and hereby elect to rescind and tender their CNL securities to the defendants sued herein. Plaintiff and Class members who have sold their CNL securities are entitled to rescissory damages.

**THIRD CLAIM**
**Violation of Section 15 of The Securities Act**
**Against Individual Defendants**

77.     Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim.

78.     This count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act.

79.     Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, a controlling person of CNL within the meaning of Section 15 of the Securities Act.  Individual Defendants had the power and influence and exercised the same to cause CNL to engage in the acts described herein.

80.     Individual Defendant's position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

81.     By virtue of the conduct alleged herein, Individual Defendants are liable for the aforesaid wrongful conduct and are liable to plaintiffs and the Class for damages suffered.

**FOURTH CLAIM**

42

**By the Proxy Class Against All Defendants for Violation of Section 14(a) and Rule 14a-9 Thereunder and Against Th Individual Defendants for Violations of Section 20(a) of the Exchange Act**

82.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except for purposes of this claim.

83.     Rule 14(a) of the Exchange Act requires that "no solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

84.     The Statements made by CNL in the Proxy Statements were false and misleading for the in at least the following respects;

(a)     the Proxy failed to disclose that CNL had used improper accounting practices and other manipulative devices to carry out a systematic scheme of materially inflating CNL's reported income and, thereby, created and maintained the appearance that CNL generated sufficient cash flow from operations to consistently pay dividends to shareholders at the levels promised in CNL's Prospectus.

(b)     the Proxy failed to disclose that since at least 2001, cash from CNL's operations has represented a decreasing percentage of the funds used to pay dividends to its shareholders.

(c)     the Proxy failed to disclose that CNL securities were sold an inflated price of $10 per share.

(d)     the Proxy failed to disclose that the Underwritten Offering that CNL had planned in conjunction with certain transaction proposed in the Proxy, including the listing of CNL's stock, was overpriced and unsupportable.

(e)     the Proxy failed to disclose that the Advisor has performed poorly for CNL and, thus, the Advisor Agreement should have been terminated under criteria that CNL's management has acknowledged would apply in evaluating and Advisor.

85.     By reason of the foregoing, the Proxy is false and misleading, in violation of Section 14(a) and the rules and regulations promulgated thereunder.

86.     The Defendants named in this Count were responsible for the contents of the proxy which is the subject of this Complaint, and for the dissemination thereof, and are thus liable under Section 14(a) of the Exchange Act.  None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements made in the Proxy Statement were true, without omissions of any material facts, and not misleading.

87.     The Individual Defendants acted as controlling persons of Bennett within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs

contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 7, 2004.

**BARKER, RODEMS & COOK, P.A.**

CHRIS A. BARKER, ESQUIRE
TRIAL COUNSEL
Florida Bar No.  885568
300 West Platt Street, Suite 150
Tampa, Florida 33606
Phone: 813/489-1001
Fax: 813/489-1008


**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA  19004
Telephone: (610) 667-7706

**Attorneys for Plaintiff**

46

04CV 1341

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

EDWIN WONG, Individually and on Behalf of
All Others Similarly Situated,

**DEFENDANTS**

CNL HOTELS & RESORTS, INC., et al.

(b) County of Residence of First Listed Plaintiff   **King, WA**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

BARKER, RODEMS & COOK, P.A.
300 West Platt Street, Suite 150
Tampa, Florida  33606  (813) 489-1001

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                     and One Box for Defendant)

|  | PLF | DEF |  | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | **PERSONAL INJURY** | | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 362 Personal Injury— Med. Malpractice | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury— Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 340 Marine | | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
another district
(specify)

☐ 6  Multidistrict
Litigation

☐ 7  Appeal to
District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

15 U.S.C. §§ 77k, 77b(a)(2), 77(o) and 78h(a).

## VII. REQUESTED IN
COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See
instructions):

JUDGE  **Presnell**

DOCKET NUMBER  **6:04-CV-1231-ORL-31JGG**

DATE  **9/6/04**

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUN _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____